IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
DELTA DIVISION

**CHRISTOPHER A. THORNSBERRY**  **PLAINTIFF**
**ADC #169180**

v.  Case No. 2:21-cv-00113-LPR-JTK

**MORIEON KELLY, et al.**  **DEFENDANTS**

**ORDER**

The Court has received the Proposed Findings and Recommendations (PFR) submitted by United States Magistrate Judge Jerome T. Kearney and the parties' Objections. PFR (Doc. 63); Defs.' Obj. to PFR (Doc. 72); Pl.'s Obj. to PFR (Doc. 73). After a *de novo* review of the PFR and careful consideration of the Objections and the entire case record, the Court approves and adopts the PFR as the Court's findings and conclusions in its entirety except to the extent the PFR conflicts with the below.

1. The PFR is correct that the First Amendment retaliation claim against Kelly (in his personal capacity) related to the alleged May 1, 2021 denial of phone privileges and spitting incident survives summary judgment. *See* PFR (Doc. 63) at 7–9. But, in the Court's view, the PFR should have more directly addressed one particular portion of the relevant qualified-immunity analysis. By May 1, 2021, was it clearly established (at a suitable level of specificity) that denying an inmate phone privileges during his 48-hour relief period or spitting in his eye—or both together—would chill an ordinary inmate from continuing with or filing a lawsuit?

This Court concludes that the answer to this question is yes. By May 1, 2021, that principle was so clearly established at a suitable level of specificity that all but the most incompetent officers would have known that the conduct described above (and further detailed in the PFR) was unlawful. For this proposition, the Court relies on the following cases decided before May 1, 2021:

1

*Peterson v. Kopp*, 754 F.3d 594, 602 (8th Cir. 2014) (finding that pepper spraying someone would chill a person of ordinary firmness), *abrogated on other grounds by Laney v. City of St. Louis*, 56 F.4th 1153, 1157 n.2 (8th Cir. 2023); *Spencer v. Jackson County*, 738 F.3d 907, 911 (8th Cir. 2013) (explaining that the denial of inmate privileges constitutes adverse action); *Nelson v. Shuffman*, 603 F.3d 439, 450 (8th Cir. 2010) (holding that holding a prisoner in isolation and denying the prisoner access to legal counsel, mail, family, recreation, and phone calls was adverse action); *Coady v. Steil*, 187 F.3d 727, 734 (7th Cir. 1999) (holding that being punched in the face would deter a person of ordinary firmness from exercising his or her First Amendment rights). *See also Green v. City of St. Louis*, 52 F.4th 734, 739 (8th Cir. 2022) (holding that it was clearly established by September 15, 2017, that deploying tear gas would chill a person of ordinary firmness). Although the conduct in these cases is not on all fours with the conduct in the instant case, the facts are analogous enough to have placed the question here beyond debate.

2. With respect to the May 3, 2021 incident, the Court agrees with the PFR that, as a matter of First Amendment retaliation law, a threat to file a grievance constitutes protected activity. *See* PFR (Doc. 63) at 11–13. The Court is far less sure, however, that such a proposition was clearly established by May 3, 2021. Mercifully, the Court need not delve into that issue. At this stage of the proceedings, the Court must assume that, by the time Daniels started harassing Thornsberry, Daniels knew Thornsberry had actually filed (as opposed to just threatened to file) a grievance against him. The reason the Court must assume this is because there is a genuine dispute of material fact as to whether Daniels knew Thornsberry had filed a grievance against him prior to the time Daniels started harassing Thornsberry. *See* Ex. 1 (Thornsberry Dep.) to Defs.' Mot. for Summ. J. (Doc. 52-1) at 12–13; Ex. 2 (Daniels Decl.) to Defs.' Mot. for Summ. J. (Doc. 52-2) at 4; Pl.'s Resp. to Defs.' Statement of Facts (Doc. 61) at 6; Thornsberry Decl. (Doc. 78). At the

summary judgment stage, the Court must adopt the pro-plaintiff version of this genuinely disputed fact.  *See Bonomo v. Boeing Co.*, 63 F.4th 736, 745 (8th Cir. 2023).

3. The closest call on the instant Motion concerns the intersection between the qualified-immunity doctrine and the gravity of Daniels's allegedly harassing, retaliatory conduct.  Was it clearly established by May 3, 2021, that throwing a handful of stewed tomatoes on Thornsberry and loudly referring to him (more than once) as a "pedophile" and a "faggot" would chill a person of ordinary firmness from filing or continuing with a grievance?  *See* Ex. 1 (Thornsberry Dep.) to Defs.' Mot. for Summ. J. (Doc. 52-1) at 10–14.[1]

The ordinary-firmness test is an objective test, "designed to weed out trivial matters from those deserving the time of the courts as real and substantial violations of the First Amendment." *Garcia v. City of Trenton*, 348 F.3d 726, 728 (8th Cir. 2003).  In considering whether the test is met, the Eighth Circuit has "distinguished between non-actionable retaliatory measures that produce only 'embarrassment, humiliation and emotional distress,' and steps that engage 'the punitive machinery of government' to impose 'concrete consequences' in retaliation for speaking out against the government."  *Rinne*, 65 F.4th at 384 (internal citation omitted) (quoting *Naucke v. City of Park Hills*, 284 F.3d 923, 928 (8th Cir. 2002) and *Garcia*, 348 F.3d at 729).

Name calling alone generally falls into the former category and thus does not chin the bar for chilling retaliatory conduct.  *See Naucke*, 284 F.3d at 928.  But generally is not always.  *See*

---

[1] Pages 5–6 of the PFR lay out the basic parameters that should guide a qualified-immunity analysis.  *See* PFR (Doc. 63) at 5–6.  The Court might have used slightly different words to discuss the doctrine, or at least emphasized different aspects of the doctrine, but those finer-point quibbles are minor and unnecessary to explore here.  The PFR and this Court seem to agree that: "A right is clearly established if a reasonable official would understand that what he is doing violates that right.  Existing precedent need not be directly on point, but it must place the constitutionality of the official's conduct beyond debate.  The dispositive question is whether the violative nature of *particular* conduct is clearly established."  *Rinne v. Camden County*, 65 F.4th 378, 384–85 (8th Cir. 2023) (internal citations and quotation marks omitted).  In the Court's view, despite laying out the basic parameters of the doctrine, the PFR does not wrestle sufficiently with the qualified-immunity question as it relates to the throwing of a handful of stewed tomatoes and the yelling of sexually stigmatizing epithets.

*id.* (citing *Mattox v. City of Forest Park*, 183 F.3d 515, 521 (6th Cir. 1999)). In the Eighth Circuit, it has long been established that labeling an inmate a snitch in front of other inmates creates, for Eighth Amendment purposes, an objectively substantial risk of serious harm to the inmate. *See Irving v. Dormire*, 519 F.3d 441, 451 (8th Cir. 2008). Logically, the test for when a verbal or physical act would chill an ordinary inmate cannot be more demanding than the test for when a verbal or physical act creates an objectively substantial risk of serious harm to an inmate. *See Williams v. Horner*, 403 F. App'x 138, 140–41 (8th Cir. 2010) ("[T]o falsely label an inmate a snitch is to unreasonably subject that inmate to the threat of a substantial risk of serious harm at the hands of his fellow inmates under the Eighth Amendment. Such allegations are therefore clearly sufficient to support . . . a First Amendment retaliation claim . . . ." (internal citation and quotation marks omitted)). Accordingly, by May 3, 2021, it was clearly established that a correctional officer would violate the First Amendment by calling an inmate a snitch in retaliation for that inmate filing a grievance—at least where the snitching implied was on another inmate or on a person helping inmates.

As the "snitch" line of cases makes clear, labeling an inmate a snitch is a grave issue because of the general opprobrium that prisoners have for snitches and the consequent likelihood of violent repercussions from other prisoners. *See, e.g., Reeves v. King*, 774 F.3d 430, 432–33 (8th Cir. 2014); *Irving*, 519 F.3d at 451. For purposes of qualified immunity, then, the Court concludes that, by May 3, 2021, it was clearly established that a correctional officer violated the First Amendment if, as retaliation for the filing of a grievance, the officer publicly labeled a prisoner as having a characteristic that would invite the general opprobrium of (and thus likely violence from) other prisoners.

This is the right level of generality at which to analyze Daniels's conduct: not too high, but

not too granular. *See Watson v. Boyd*, 2 F.4th 1106, 1113 (8th Cir. 2021) ("The law must be sufficiently clear such that '*every* reasonable [officer] would understand what he is doing is unlawful.'" (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018)) (alteration in original)). And, judged at this level of granularity, it was or should have been clear to Daniels that the First Amendment prohibited him from retaliating against Thornsberry by calling Thornsberry a pedophile multiple times and in a way that other inmates could hear. *See* Ex. 1 (Thornsberry Dep.) to Defs.' Mot. for Summ. J. (Doc. 52-1) at 10, 12, 14. Labeling an inmate a pedophile is, in the Court's view, on par with labeling an inmate a snitch. The general opprobrium of, and potential for violent repercussions from, other inmates might not be exact mirror images between the two labels, but they are close enough that all but the most incompetent officers would have known that the reasoning of the "snitch" line of cases applies to the pedophile label. *See Moore v. Mann*, 823 F. App'x 92, 96 (3d Cir. 2020) (unpublished) (per curiam); *Brown v. Narvais*, 265 F. App'x 734, 735–36 (10th Cir. 2008) (unpublished).[2] Daniels thus does not get qualified immunity at this stage of the proceedings.[3]

---

[2] Defendants argue, among other things, that only *falsely* labeling an inmate a snitch (and thus only *falsely* labeling an inmate a pedophile or gay) could even possibly count as clearly established law. Defs.' Obj. to PFR (Doc. 72) at 5. The Court does not believe the previous cases are so narrowly confined. The general opprobrium and consequent potential for violence faced by inmates labeled as snitches is enhanced, not mitigated, if they actually snitched. And the general opprobrium and consequent potential for violence faced by inmates labeled as pedophiles is enhanced, not mitigated, if they actually are pedophiles. Calling an inmate a snitch or pedophile is problematic not only because it might provide (truthful or untruthful) information to other inmates that those inmates did not have. It is also problematic because it makes the snitch or pedophile characteristic top of mind for some inmates and can thus inflame their passions.

[3] At trial, the Court will have to get the jury to settle certain genuinely disputed fact issues before making a final qualified-immunity determination. *Cf. Ellison v. Lesher*, 796 F.3d 910, 918 (8th Cir. 2015); *Littrell v. Franklin*, 388 F.3d 578, 585 (8th Cir. 2004); *Lampkins v. Thompson*, 337 F.3d 1009, 1014 (8th Cir. 2003). For one example, if the jury finds as a matter of fact that, at the time Daniels verbally and physically harassed Thornsberry on May 3, 2021, Daniels did not yet know that Thornsberry had filed a grievance against him, then the Court will have to more seriously analyze the question of whether it was clearly established by May 3, 2021, that a threat to file a grievance (as opposed to actually filing a grievance) counts as protected activity. For another example, depending on how the evidence comes in at trial, the jury might need to resolve whether Daniels called Thornsberry a pedophile and other slurs in a way that could be heard by other inmates. If the jury finds that other inmates could not have heard the terms, Daniels might end up being entitled to qualified immunity.

Because it was clearly established by May 3, 2021, that calling an inmate a pedophile multiple times in a way that other inmates could hear would chill a person of ordinary firmness from filing or continuing to pursue a grievance, the Court need not analyze: (1) whether it was clearly established by May 3, 2021, that calling an inmate gay would chill a person of ordinary firmness from filing or continuing to pursue a grievance;[4] (2) whether it was clearly established by May 3, 2021, that throwing a handful of stewed tomatoes at an inmate would chill a person of ordinary firmness from filing or continuing to pursue a grievance; or (3) whether it was clearly established by May 3, 2021, that the cumulative effect of all of Daniels's verbal and physical actions together would chill a person of ordinary firmness from filing or continuing to pursue a grievance.[5]

Accordingly, the Court GRANTS IN PART and DENIES IN PART Defendants' Motion for Summary Judgment. Defs.' Mot. for Summ. J. (Doc. 52). Judgment is granted to Defendants on all live claims except for (1) the personal capacity First Amendment retaliation claim against

---

[4] With respect to the gay slur that Daniels allegedly used (multiple times), the Court notes that several other district courts have held that a correctional officer calling a prisoner gay in front of other inmates would either create a substantial risk of harm or deter a person of ordinary firmness from exercising his or her constitutional rights. *See e.g.*, *Bryant v. Raddad*, No. 2:21-cv-01116, 2023 WL 5538016, at *4 (E.D. Pa. Aug. 28, 2023) ("[O]uting [the plaintiff] as a homosexual[] was severe and would deter a person of ordinary firmness from exercising his constitutional rights."); *Reynolds v. Mattson*, No. 2:07-cv-59, 2008 WL 2704750, at *2 (W.D. Mich. July 9, 2008) (finding that falsely characterizing a prisoner as a homosexual would constitute adverse action if the Plaintiff "were able to show that such a label could affect a prisoner with the prison environment"); *Thomas v. District of Columbia*, 887 F. Supp. 1, 4 (D.D.C. 1995) ("[I]n the prison context . . . one can think of few acts that could be more likely to lead to physical injury than spreading rumors of homosexuality . . . .").

[5] Daniels apparently called Thornsberry a snitch too. But Thornsberry's assertion is that Daniels "told the other inmates [Thornsberry] was snitching by filing grievances on [Daniels] . . . ." Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 60) at 3. *See also id.* at 5 (stating that Daniels "yelled to the other inmates telling them that [Thornsberry is] . . . a snitch, that [Thornsberry] snitched on him by filing a grievance on him"); *id.* at 6 ("The defendant Daniels called the plaintiff a snitch and said the plaintiff snitched by filing a grievance on Daniels."). As the Eighth Circuit has explained in a slightly different context: "The focus of 'snitch' cases is the possibility of retaliation by other inmates. . . . [D]isclosure that an inmate filed grievances against correctional officers for the mistreatment of inmates does not place the reporting inmate at a substantial risk of serious harm, given that inmates are unlikely to retaliate against a fellow inmate for seeking to end abuse by prison guards." *Reeves*, 774 F.3d at 432. Accordingly, Daniels's snitch comment does not directly add anything to the mix in the instant case. The importance of the "snitch" cases to this Order is instead related to the analogy one can draw between being labeled a snitch and being labeled a pedophile.

6

Defendant Kelly arising out of the May 1, 2021 denial of phone privileges and spitting incident, and (2) the personal capacity First Amendment retaliation claim against Daniels arising out of the May 3, 2021 verbal and physical harassment incident. These two claims proceed to trial, although partial judgment is granted in favor of Defendants on these two claims insofar as the compensatory-damages issues present within both claims are hereby resolved against Thornsberry.[6]

IT IS SO ORDERED this 29th day of August 2024.

                                                LEE P. RUDOFSKY
                                                UNITED STATES DISTRICT JUDGE

---

[6] Given that we are moving towards trial, the Court wishes to know whether Mr. Thornsberry would like the Court to appoint him pro bono counsel. The Court has found that the appointment of counsel for trial purposes greatly benefits an inmate who has been operating *pro se* through the summary judgment stage. Within 30 days from the date of this Order, Mr. Thornsberry is directed to file a Notice informing the Court of whether he wants the appointment of counsel.